RUTLAND SAV. BANK v. ISBELL et al.

No. 5307.

Court of Civil Appeals of Texas. Texarkana.

May 18, 1939.

Rehearing Denied June 1, 1939.

506

Renfro & Kilgore, of Dallas, for appellant.

Moore & Moore, of Paris, and Sam Hocker, of Clarksville, for appellees.

WILLIAMS, Justice.

Rutland Savings Bank appeals from a judgment which denied it a recovery of the title and possession of 462 acres of land under count one of its pleadings and which allowed only a partial recovery under count two, wherein appellant sought in the alternative a judgment for the principal, interest and attorney's fee due on four notes of $1,000 each and one of $19,000 with foreclosure of deed of trust lien on the land it sought to recover outright in count one. The judgment allowed appellant a recovery of $13,273.33 against some of the defendants with foreclosure of the lien on only an undivided ¼ interest. The cause was tried without a jury. The court made no findings of fact and conclusions of law as such, but did set out findings in its judgment, as will appear in the course of this opinion. Named as defendants were John D. Isbell and wife, Annie; G. W. Isbell, a widower; Jim A. Isbell and wife, Lizzie; G. W. Isbell, administrator of the estate of Sam R. Isbell, deceased; Edith Crabbe, surviving wife of Sam R. Isbell, and her present husband, J. M. Crabbe; Billie Wayne Isbell and Sylvia L. Isbell, minors, and the only children of Sam R. Isbell; G. W. Isbell, guardian of the estate of said minors; Scott Title and Trust Company; and J. T. Tucker.

The litigation arose out of the following transactions:—In 1914 R. Isbell and wife conveyed to their four sons, Sam R., John D., Jim A., and G. W. Isbell, all unmarried, the land described in the pleadings. In this conveyance these sons assumed the payment of certain vendor's lien notes theretofore executed by the father in part payment of the land which he had purchased from Tucker. They each acquired an undivided ¼ interest as their separate estate.

In 1915, in renewal and extension of the balance due on said notes, the sons, who were still single, executed a note for $7,000 payable to Luther Reece, the then legal holder and owner of the said notes and liens securing them. They also executed a deed of trust on this land to better secure its payment. The sons executed a note for $15,000 payable to one W. H. Evans, and on March 21, 1923, joined by their wives (having married in the meantime), executed a deed of trust on this land to secure the payment of this note. This $15,000 was used by them for machinery and labor costs in constructing a levee upon the land in controversy and other adjacent lands owned by them.

On October 11, 1923, in renewal and extension of above two notes, the sons, joined by their wives, executed a $23,000 note and a deed of trust on the land in controversy, payable to and in favor of D. H. Scott & Son. The Reece and the Evans notes, together with the respective liens, were assigned to D. H. Scott & Son. This $23,000 note was then assigned to appellant, for a valuable consideration, before its maturity. In connection with the last-mentioned transaction the sons executed five notes for the aggregate sum of $2,300, payable to the Scotts, which represented 2% interest on the loan and constituted the commission which the Scotts expected to make out of the loan transaction.

The $23,000 note assigned to appellant being unpaid at its maturity, January 21, 1929, was re-transferred to Scott & Son. On March 30, 1930, Jim A. Isbell and John D. Isbell, joined by their wives, G. W. Isbell, then a widower, and G. W. Isbell, guardian of the estate of Billie W. Isbell and Sylvia L. Isbell, minors, and Edith Isbell, surviving wife of Sam R. Isbell, executed in renewal and as extension of the $23,000 note four notes of $1,000 each, and one note for $19,000 payable to Scott Title & Trust Company, being the notes sued upon in count two. They also executed a deed of trust on the land to secure these notes. The notes and lien were immediately transferred to ap-

pellant. As part of the extension last mentioned, notes in the total sum of $1,050 were executed to cover 1% of the interest on above note, and a second lien deed of trust executed to secure same. The interest notes were retained by Scott Title & Trust Company. Default being made in the payment of the interest note, the trustee sold said land on February 6, 1934, under the provisions of this second lien deed of trust. The trust company bought the land at the sale and received a deed to same. Thereupon the land was rented by the trust company to the Isbells for the year 1934, on the rental terms of ⅓ of the grain and ¼ of the cotton and seed grown for that year.

The notes held by appellant also being in default, suit was filed by it in a Dallas county district court to recover the amount due thereon and for foreclosure of its first deed of trust lien. Appellant established its debt and lien in the Dallas court and took a default judgment foreclosing its lien against only Scott Title & Trust Company and Tucker. This suit was reduced to judgment on May 7, 1935, which was subsequent to the date of the Trustee's sale under the second lien deed of trust. Under order of sale issued out of the Dallas court the appellant purchased the land in controversy on August 6, 1935.

Under count one, wherein appellant sought recovery of the title and possession of the land, it pleaded and introduced in evidence the foregoing mentioned instruments and transactions. Appellant introduced in evidence an instrument in writing signed and acknowledged by appellees in which they had agreed prior to February 6, 1934, that the trustee named in the second lien deed of trust of 1930 "may" execute the power of sale held on that date. Appellant contends that the sale by the trustee in February, 1934, was regular and valid and therefore the trustee's deed conveyed the title out of appellees into the Scotts, the purchaser under the sale, subject to the debt and first lien then held by appellant. It is a fact as contended for by appellant there existed a valid lien against the land, regardless of the question of homestead, later herein discussed, to the extent of at least $7,702.50 and interest then due on the unpaid vendor's lien purchase notes which had been renewed, extended and merged into the Scott transactions. To this extent the foreclosure on the second lien deed of trust was not void. Belcher Land Mortgage Co. v. Taylor, Tex.Com.App., 212 S.W. 647; Hampshire v. Greeves, 104 Tex. 620, 143 S.W. 147.

■ Appellant therefore asserts that by reason of foreclosure of its first lien against the Scotts in the Dallas district court and its purchase of the land under the order of sale, the deed executed in pursuance thereto conveyed the title out of the Scotts into appellant. Before the order of sale out of the Dallas court had been executed, appellees had instituted suit in the district court against the Scotts in trespass to try title. The record does not disclose when this suit was filed. On August 5, 1935, appellees obtained judgment by default against the Scotts for title and possession of the land. Appellant was not a party to the Red River court suit. Neither were appellees parties to the Dallas court judgment. The Scotts made default in each suit, including the present one. So we conclude that both judgments, including the instant one, foreclosed any claim of lien that the Scotts may have had against the land, but no further.

The other issues presented, supported by various and extensive pleadings, briefly stated, are: (1) The two series of loan contracts had with the Scotts were usurious; (2) the land was homestead property of the four sons and their wives in 1923 and in 1930, and therefore not subject to a valid lien to secure the debt; (3) that the renewal of the debt and lien in 1930 was invalid and unenforceable as to the Sam R. Isbell undivided ¼ interest.

■ The court found both transactions with the Scotts to be usurious contracts by reason of certain clauses appearing in the second deed of trust in each transaction when considered with the provisions of each first deed of trust; that defendants had paid to appellant a total usurious interest of $10,933.33, and applied this sum as a credit on the notes dated March 10, 1930. From the conclusions reached, it becomes unnecessary to discuss the interest paid or the credit so allowed. The provisions in the above-mentioned deeds of trust will not be detailed, being identical with those set out in the opinion rendered by this court in Pan American Life Ins. Co. v. Boyd, 124 S.W. 2d 917, writ refused. The instant trial was had prior to the decision in that case, and counsel for appellees concede that the issue here upon the question of usury is

identical with that urged in above case, with one exception. In the instant case evidence was introduced that if the $23,000 note had been assessed for taxes at Paris, Lamar County, Texas, the domicile of the Scotts, the original payee named in said note, the same would have been assessed at 66⅔% of its face value at the tax rate of $4.50 per $100. It is appellees' position that such taxes and tax rate when added to the interest rate provided for in both deeds of trust of 1923 would amount to more than 10% per annum that the makers could have been required to pay for the use of this borrowed money.

The first deed of trust contained a stipulation which required the obligors "to pay promptly when due any and all taxes of any and every nature that may be levied or assessed against this deed of trust, or against the debt hereby secured or against any interest in the above described note created in the mortgage thereby, * * *." This note was not assessed for taxes. But, conceding that such note was subject to the taxes at the above rate, this clause still would not have made the contract usurious, because of the succeeding portion of the above clause which reads, " * * * up to, but in no event exceeding an amount which when added to the rate of interest charged for the period covered by the taxes shall equal the maximum rate of interest per annum allowed by the laws of this State for that period." In addition to that part of the clause just quoted, the second deed of trust contained a further provision, to-wit: "it being the intention of the parties to conform strictly to the usury laws now in force, any of the said contracts for interest shall be held subject to reduction in the amount under said usury laws as now or hereafter construed by courts having jurisdiction." To discuss the effect of either of the provisions quoted from the Scotts' contracts would be a repetition of the observations made in Nevills v. Harris, 129 Tex. 190, 102 S.W.2d 1046, 109 A.L.R. 1464; Kansas City Life Ins. Co. v. Duvall, 129 Tex. 287, 104 S.W.2d 11; Pan American Life Ins. Co. v. Boyd, supra. Upon these authorities it is concluded that neither of the loan contracts was usurious.

■ This suit was filed more than four years after the maturity date of the $23,-000 note. Appellees claim that the renewal of the debt and lien in 1930 by G. W. Isbell as guardian of the estate of the two minors was invalid and unenforceable against the Sam R. Isbell ¼ interest. The four years' statute of limitation, Article 5527, R.C.S., was urged as a bar to subject this interest to the lien and debt declared upon. Prior to the 1930 renewal, the probate court of Red River county acted upon an application of this guardian and granted such guardian authority to renew outstanding and due deed of trust liens, "in order to preserve the estate of said minors." Article 4212, R.C.S. It is urged that this action of the probate court was invalid for the reason that administration was then pending upon the estate of Sam R. Isbell. The evidence discloses that G. W. Isbell was administrator of that estate at the time of this trial. Further than this the record does not show an administrator had been appointed at the time of the 1930 renewal. In fact, no evidence was introduced showing when such administration was granted. For this reason we deem it unnecessary to determine the legal power of a probate court to take jurisdiction of a deceased interest in an alleged partnership enterprise and property, then charged with debt. This debt was past due when renewed. The renewal carried a 1% less interest rate. The guardian of the estate of the minors, the surviving widow of Sam R. Isbell, his three co-partners and the three survivors of this enterprise, all executed this renewal which, in our judgment, kept the lien alive against this interest.

■ Appellant denied that this land was impressed with a homestead character as appellees claimed it to be in 1923 and in 1930, and further pleaded that if in fact the same constituted their homestead, the appellees were estopped to set up such a claim because of certain acts and representations of appellees, specifically set out in its pleadings.

G. W. Isbell was a widower at the time he executed the 1930 renewal. The court found that same constituted a valid lien against his undivided ¼ interest in the land. This finding is not assailed. The loan contracts not being usurious, this ¼ interest of G. W. Isbell is subject to the 1930 deed of trust lien to the extent of the amount due on the notes sued upon.

■ Edith Isbell, the surviving wife of Sam R. Isbell, was a feme sole in 1930 when she executed the notes and deed of trust in that year. This act was binding upon her and created a valid lien on the life estate she had inherited from her husband. Keels v. First National Bank, Tex.

Civ.App., 71 S.W.2d 372; Allen v. Farm & Home Savings & Loan Ass'n, Tex.Civ. App., 58 S.W.2d 866, writ refused.

Four hundred and twenty-eight acres are situated in the bottoms and known as bottom land. This was fertile farming land but subject to overflow, unhealthy and unsuitable for residential purposes. The other land in issue consists of 34 acres, situated on a ridge or high land about ¾ mile distant from the large tract. After the Isbells acquired the land from their father, they erected additional dwellings, barns and outhouses upon the 34 acres. There were eight dwellings on the small tract. These were occupied by the Isbells and their tenants through the years, who went to and fro in cultivating the bottom land. The improvements placed on the bottom land consisted of a shed to protect plow tools and feed, and a well to furnish stock with water when the land was being cultivated. The interrelated uses made of both tracts would constitute them one farming unit.

Jim A. Isbell, who married in 1915, continued to live in one of the eight dwellings until 1920, when, as he testified, on account of sickness he and his family moved on his father's place four or five miles distant. He lived on his father's place ten years. In 1930 he moved to a tract south of and adjoining the 34-acre tract. This tract to which he moved had been bought by him from his mother after the death of his father and was no part of the land in litigation nor any part of any of the land set out in the homestead designation later herein discussed. From his own testimony, he was not living on any of the land in controversy in 1923 or in 1930. But he claims to have left teams and tools on the farm and claims to have cultivated some part of the land every year, including 1923 and 1930, and intended later to move back to the 34-acre tract.

Sam R. Isbell, after his marriage in 1921, resided on the 34-acre tract. Prior to 1923 and during that year, he and his wife lived on his father's farm 1¼ miles distant, but intended to move back. His widow and two minor children were living on the 34-acre tract in 1930. Sam kept a part of his tools and teams there and worked a part of the land in controversy until his death in 1928.

John D. Isbell, who married in 1916, was living with his wife upon the 34 acres in 1923 in a four-room house at the time the 1923 loan contract was executed. In 1921 and 1922 they lived on his father's farm on the prairie, having moved there to send their children to school. This family was residing on this 34 acres when a representative of the loan company inspected the place prior to making the loan. John D. Isbell claims to have been plowing when the appraiser called. He claims to have worked a part of the land every year.

The trial court found that the several pleas of homestead of the defendants and intervenors, namely, Jim A. Isbell and wife, John D. Isbell and wife, and the minor defendants, should be sustained and that as to them no lien exists by reason of either deed of trust of October 11, 1923, or the one of March 10, 1930, and denied a foreclosure. It is to be observed that each brother with his family had resided upon the land in controversy prior to 1923, and to some extent had impressed same as a homestead. Whether this land had been abandoned as a homestead, under the facts in this record, became an issue of fact. The findings of the court to the extent that this land constituted the homestead of above-named parties will not be disturbed. Life Ins. Co. of Va. v. Weatherford, Tex. Civ.App., 60 S.W.2d 883; Blanks v. First National Bank of Seymour, Tex.Civ.App., 44 S.W.2d 393.

But whether the respective interests were subject to the deed of trust lien requires a consideration of the question of estoppel. Appellant offered in evidence the deed of trust executed by the Isbells and their wives on March 21, 1923, filed for record the next day. This instrument which describes the land in controversy contains a clause which reads: "We do not live on any of this land and do not contemplate living on any of the same, and the same does not contribute to our support." Further in support of the plea of estoppel appellant offered in evidence a written application signed and acknowledged by the Isbells and their wives on October 13, 1923. In this application for the loan of $23,000 the Isbells offered and described the property in controversy as security. Various questions were answered in the application. We shall detail only those we consider pertinent to the question here involved. They stated in response to questions that after they acquired the land in 1914 they had built a private levee at a cost of $20,000; eight houses at $5,000; and cleared 230 acres of land at $3,500;

that the property and buildings were then occupied and used by "tenants under our own supervision;" that the land was rented for 1923 on a rental of a part of the crops; that this money was being borrowed "to take up vendor's lien notes;" that they owned 24 horses and mules, and 100 head of cattle. To question No. 43 reading: "If the property or any portion of it is encumbered now in any way by existing mortgages, trust deeds, judgment liens or suits, or liens of any kind, state the amount and legal holder of each and give particulars in full," they answered, "$7,000 held by Reece & Jones, and $15,000 held by Evans." To question No. 44 they answered: "I (we) own real estate including the land herein described, to the value of $157,700; and personal property to the value of $10,000, and my (our) liabilities, including this loan, will not exceed $54,600." Question No. 45 reads: "Describe your homestead, price paid, and incumbrances." This was answered: "This is renewal of vendor's lien. See description of homesteads of record in Red River County." This application closed with this representation: "I (we) understand the loan is granted upon the representations herein made by me (us) as to the said premises and the title to same and I (we) do solemnly swear that the said representations are true in every particular."

Appellant introduced in evidence the respective homestead designation of G. W. Isbell and his wife, Lizzie; John D. and his wife, Annie; and Sam R. and his wife, Edith. Each homestead designation is dated October 11, 1923, and the acknowledgments of all the parties were taken October 13, 1923. These designations were filed for record on October 23, 1923. Each couple designated as their homestead the following land: "My undivided ½ interest in and to the following described tracts of land: 208 acres out of the William Clapp and I. H. Fishback surveys and contains a reference to volume and page of deed records for description of same; 148 acres, being the A. P. Love survey, Abstract No. 1047; 187 acres being the J. E. Maxwell survey and contains a reference for description to volume and page of deed record; the Henry Caton 80 acre survey, Abstract No. 1409; and 167 acres off the north side of the T. T. Hubbard survey and contains a reference to volume and page of deed records for further description."

The deeds of trust in the first loan transaction with the Scotts are dated October 11, 1923, acknowledged on October 13th, and filed for record on October 23, 1923. The acknowledgment of the Isbells and their wives to the application for the loan, to the homestead designations and to above deeds of trust were all taken by M. L. Wren, a notary public of Red River county. It is to be concluded that these various instruments were executed and intended as a part of the transaction leading up to the 1923 loan. The Scotts relied upon these representations, believed them to be true, and claim to have had no information of any kind that any of the Isbells were using any part of the land as a homestead. On October 29, 1923, the Scotts issued their check for $15,653.84 to cover with accrued interest the Evans item, and on October 30, 1923, issued check for $7,702.50 to cover amount due on the other note. Tax rendition sheets introduced in evidence discloses that the Isbells had designated the same tracts of land listed in the homestead designation as their homesteads in seeking exemption from state taxes.

The homestead designations were on printed forms out of the Scotts' office. Their contents were in print except names of parties and description of the lands. The Isbells who testified supposed the tracts of land referred to in the designations were taken from the tax rolls of Isbell brothers. They and their wives admitted that they signed and executed all these instruments and intended to give the land involved as security for the loan, but claimed they did not know they had made such homestead designation until this suit came up.

Subsequent to 1915 and prior to 1923, the Isbells had acquired by purchase the tracts listed in the homestead designation amounting to 800 acres. The tracts were not adjacent to each other. Some adjoined the land in controversy. Some was wild land. Only one tract had suitable dwellings on it, and this was always rented out to tenants. Some of these tracts were later improved by clearing up additional land and by fencing. The Isbells never resided at any time upon any of the 800 acres.

So we have here the representations and declarations of the head of a family and his wife that not the land in controversy but other lands then owned by them constituted their homestead. In their application they directed the lender to the home-

stead designation. In the Evans deed of trust they declared this land not to be their homestead. These representations were relied and acted upon to the injury of this lender. Sam R. Isbell and Jim A. Isbell did not reside upon the land in March, 1923, when the representations in the Evans deed of trust were made. They were not living on the land in October, 1923, when the Scotts acted on their application and representations and advanced the funds to take up the debts and liens. They do not claim to have been living on this land but assert that they then intended at some future time to return to it. With the exception of John D. Isbell, tenants occupied the dwellings. They then owned the 800 acres listed in their homestead designation. With the exception of the status of John D. Isbell, there are no facts which would have indicated to the lenders the untruth of these representations. Quoting from Parrish v. Hawes, 95 Tex. 185, 66 S.W. 209, 212: "There was no reason why the plain and unequivocal statement by the parties who alone knew the facts stated might not be implicitly relied on by persons so dealing with them. While it may be true that a person cannot assert an estoppel based upon a representation which, under the circumstances, he ought not to have believed and acted upon, it is, we think, equally true that where one states a fact which is or should be within his knowledge, intending that it be believed and acted on as true, he should not ordinarily be heard to say that the other party ought not to have believed him; there being nothing to show to such other the falsity of the representation."

 We therefore conclude upon the authority of First Texas Joint Stock Land Bank v. Chapman, Tex.Civ.App., 48 S.W. 2d 651, and cases therein discussed; Dallas Building & Loan Ass'n v. Patterson, Tex.Civ.App., 48 S.W.2d 657; Skiles v. Shropshire, 124 Tex. 462, 77 S.W.2d 872; Carstens v. Landrum, Tex.Com.App., 17 S.W.2d 803; and Parrish v. Hawes, supra, that appellees are estopped from claiming the interests of Sam R. Isbell and Jim A. Isbell in the land was their homestead in 1923.

John D. Isbell was cultivating a part of the land in controversy in 1923 when an appraiser, an agent of the Scotts, called to inspect the property. He and his family occupied one of the dwellings on the 34 acres. As stated in Texas Land & Loan

Co. v. Blalock, 76 Tex. 85, 13 S.W. 12, 13, discussed in Parrish v. Hawes, supra: "The fact of actual possession and use, as the home of the family, was one against which the lender could not shut its eyes. * * *" This interest is subject to the lien only to the extent of the amount due on the vendor's lien notes.

The judgment of the trial court is reversed and here remanded with instructions to enter judgment for the amount due upon the notes sued on in favor of appellant as against the defendants G. W. Isbell, Jim A. Isbell, and John D. Isbell, with foreclosure of its deed of trust lien as against all defendants and intervenors only to the extent of the amount due on the vendor's lien notes which merged into the notes sued on with interest and attorney's fees; and this deed of trust lien be further foreclosed as to all the defendants except the ¼ interest owned by John D. Isbell, to satisfy the amount of above personal judgment to be entered, less the amount determined to be due on the vendor's lien notes.

The judgment is reversed and remanded with instructions.